IN THE SUPERIOR COURT OF WASHINGTON FOR KING COUNTY

MICHELE ROSATI,

               Plaintiff,

       v.

AMAZON.COM, INC., a Delaware corporation,

               Defendant.

NO.

COMPLAINT FOR RELIEF PURSUANT TO 8 DELAWARE GENERAL CORPORATION LAW CODE SECTION 220 TO COMPEL INSPECTION OF BOOKS AND RECORDS

Plaintiff Michele Rosati ("Plaintiff") herein alleges, upon knowledge as to herself and her own actions, and upon information and belief as to all other matters, as follows:

## I.    <u>NATURE OF THE ACTION</u>

1.1    In this action, Plaintiff seeks to enforce her right to inspect certain corporate books and records of defendant Amazon.com, Inc. ("Amazon" or the "Company"), a Delaware corporation, pursuant to title 8, section 220 of the Delaware General Corporation Law Code ("Section 220").  Plaintiff is a beneficial stockholder of the Company.

1.2    On September 22, 2020, Plaintiff sent an inspection demand to the Company (the "Inspection Demand").   The Inspection Demand complied with all the form and manner requirements of Section 220, including that it was accompanied by a power of attorney, an oath,

COMPLAINT - 1

and proof of Plaintiff's current ownership of Amazon stock.  The Company received the letter on September 23, 2020.[1]

1.3     In the Inspection Demand, Plaintiff explained that she wishes to investigate potential wrongdoing occurring at the Company, including potential breaches of fiduciary duty. Plaintiff has legitimate concerns as to whether Amazon violated the Illinois Biometric Information Privacy Act ("BIPA") and whether the Company was engaging in antitrust violations.

1.4     The Inspection Demand provided ample evidence of such possible wrongdoing and mismanagement at Amazon.  Concerning BIPA, the Inspection Demand explained that Amazon had been developing facial recognition software for years and purchased International Business Machines Corporation's ("IBM") "Diversity in Faces" dataset in 2019 to improve this software.  In developing this facial recognition software, Amazon collected, stored, and used individuals' biometric identifiers without ever informing those before, a direct violation of BIPA.

1.5     Regarding Amazon's anticompetitive violations, the Inspection Demand again contained detailed information how the Company uses third-party seller data it has access to as an effective middleman to develop its own competing suite of products.  The Company then undercuts the third-party on price.  Amazon's anticompetitive actions have led to investigations by, at a minimum: (i) the U.S. Congress; (ii) the European Union; (iii) the State of California; and (iv) the State of Washington.  Accordingly, Plaintiff has ample reason to suspect wrongdoing at Amazon, more than satisfying the credible basis standard necessary to justify the inspection.

---

1 True and correct copies of the Inspection Demand and proof of delivery are attached hereto as Exhibit A and B, respectively.

1.6     On October 19, 2020, the Company's counsel responded to Plaintiff's Inspection Demand with a short perfunctory two-and-a-half-page rejection. The rejection letter did; however, state Amazon was willing to discuss making a production to Plaintiff.

1.7     Over the next three months, Plaintiff attempted to reach a resolution with the Company.  Unfortunately, Amazon steadfastly insisted on including in a nondisclosure agreement draconian terms that would prevent Plaintiff from bringing certain of her claims derivatively and otherwise waiving her rights.  Despite providing directly on point authority that Amazon's position was untenable and contrary to the law, it did not move.  Further, Amazon never stated what documents it was willing to allow Plaintiff to inspect.

1.8     On February 1, 2021, Amazon stated that it would "follow up" with Plaintiff that week about her Inspection Demand.  Instead, she has been met with silence.  It has now been approximately six months since Plaintiff sent the Inspection Demand and she is apparently no closer to reviewing the demanded books and records.  Amazon's actions have effectively denied Plaintiff her statutory rights.

1.9     In light of Amazon's effective refusal, Plaintiff now respectfully asks the Court to order Amazon to produce the demanded books and records that she is entitled to review as a stockholder of the Company.

## II.     <u>JURISDICTION AND VENUE</u>

2.1     This Court retains general jurisdiction over each named defendant who is a resident of Washington.  Additionally, this Court has specific jurisdiction over each named nonresident defendant because these defendants maintain sufficient minimum contacts with Washington to render jurisdiction by this Court permissible under traditional notions of fair play

1  and substantial justice. Amazon is headquartered in Washington. Finally, exercising
2  jurisdiction over any nonresident defendant is reasonable under these circumstances.

3      2.2   Venue is proper in this Court because defendant Amazon maintains executive
4  offices in this County, a substantial portion of the transactions and wrongs complained of
5  herein, including the defendant's primary participation in the wrongful acts detailed herein
6  occurred in this County, and defendant has received substantial compensation in this County by
7  doing business here and engaging in numerous activities that had an effect in this County.

8                  III.   **THE PARTIES**

9      3.1   Plaintiff Michele Rosati is an owner of Amazon's common stock.

10     3.2   Defendant Amazon is a Delaware corporation with principal executive offices
11 located at 410 Terry Avenue North, Seattle, Washington.

12  **IV.   THE COMPANY'S UNAUTHORIZED COLLECTION OF INDIVIDUALS'
         INFORMATION VIOLATES THE LAW**

13 **Biometrics and Facial Recognition Technology**

14     4.1   Biometrics is the technical term for measurements used to identify people's
15 unique physical characteristics. Examples of biometric identifiers include an individual's DNA,
16 fingerprints, irises or retinas, voiceprints, and facial geometry. The uniqueness and potential
17 permanence of biometric identifiers present an advantage for businesses to accurately identify
18 and distinguish individuals. Businesses presently use biometrics in a wide variety of
19 applications, including data collection.

20     4.2   One technological application of biometrics is facial recognition software.
21 Facial recognition software uses biometrics to map facial features from a photograph or video.
22 In particular, the software uses an algorithm that calculates a unique digital representation of the
23 face based on the geometric relationship of a person's facial features (such as the distance

24

COMPLAINT - 4

between their eyes, ears, and nose), creating a face signature or map.  The software then compares the information with a database of known faces to find a match.

4.3     Facial recognition technology has seen steady improvement over the past decade. Lower costs and increased accuracy have allowed companies such as Amazon to deploy increasingly sophisticated facial recognition software in their applications.  However, this increased sophistication has raised serious privacy concerns.  Biometrics present potential privacy threats to the individual if compromised, such as a heightened risk for identity theft. During a U.S. Senate hearing in 2012 on the use of facial recognition technology, Senator Al Franken noted that "[o]nce someone has your faceprint, they can get your name, they can find your social networking account, and they can find and track you in the street, in the stores that you visit, the Government buildings you enter, and the photos your friends post online."  He added, "facial recognition technology can allow others to access all of that information from a distance, without your knowledge and in about as much time as it takes to snap a photo." Faceprints can even be used to identify protesters at political rallies and "target them for selective jailing and prosecution, stifling their First Amendment rights."

4.4     The U.S. Federal Trade Commission ("FTC") has also noted the public's concerns over privacy in social networks that "databases of photos or biometric data may be susceptible to breaches and hacking."   The FTC urged companies using facial recognition technology to ask for consent *before* collecting biometric information from a photo.  In its best practices guidelines, the FTC addressed social networks in particular, stating, "before using facial recognition to identify an individual it could not otherwise identify, the company should obtain the affirmative express consent of the individual in the image."

/ / /

COMPLAINT - 5

1    **The Illinois BIPA**

2         4.5     In 2008, the Illinois General Assembly enacted the Illinois BIPA to enhance the

3    state's "limited State law regulating the collection, use, safeguarding, and storage of

4    biometrics[.]" 740 Ill. Comp. Stat. §14/5(e).   BIPA defines a "biometric identifier" as including

5    a "scan of hand or face geometry."  740 Ill. Comp. Stat. §14/10.  The legislature noted that

6    "[b]iometrics are unlike other unique identifiers that are used to access finances or other

7    sensitive information," because while social security numbers can be changed if compromised,

8    biometric data are "biologically unique to the individual," and "once compromised, the

9    individual has no recourse, is at heightened risk for identity theft, and is likely to withdraw from

10   biometric-facilitated transactions."  740 Ill. Comp. Stat. §14/5(c).

11        4.6     Under BIPA, companies must have a public, written policy establishing a

12   retention schedule for biometric identifiers and information and guidelines for their permanent

13   destruction.  Moreover, a company may not collect or otherwise obtain a person or a customer's

14   biometric identifier or biometric information without informing the subject in writing and

15   securing a written release.  Nor may a company profit from an individual's biometric identifiers

16   and information.  In particular, section 14/15(a)-(c) of BIPA provides:

17            a)      A private entity in possession of biometric identifiers or biometric
18       information must develop a written policy, made available to the public,
         establishing a retention schedule and guidelines for permanently destroying
19       biometric identifiers and biometric information when the initial purpose for
         collecting or obtaining such identifiers or information has been satisfied or within
20       3 years of the individual's last interaction with the private entity, whichever
         occurs first.  Absent a valid warrant or subpoena issued by a court of competent
21       jurisdiction, a private entity in possession of biometric identifiers or biometric
         information must comply with its established retention schedule and destruction
22       guidelines.

23            b)      No private entity may collect, capture, purchase, receive through trade, or
         otherwise obtain a person's or a customer's biometric identifier or biometric
24       information, unless it first:

1) informs the subject or the subject's legally authorized representative in writing that a biometric identifier or biometric information is being collected or stored;

2) informs the subject or the subject's legally authorized representative in writing of the specific purpose and length of term for which a biometric identifier or biometric information is being collected, stored, and used; and

3) receives a written release executed by the subject of the biometric identifier or biometric information or the subject's legally authorized representative.

c)     No private entity in possession of a biometric identifier or biometric information may sell, lease, trade, or otherwise profit from a person's or a customer's biometric identifier or biometric information.

**The Gender Shades Study**

4.7     Facial recognition software algorithms that are trained with biased data can result in algorithmic discrimination.[2]  This, in turn, can lead to facial recognition products that are less effective at identifying certain types of faces.  For example, an algorithm trained on dataset that underrepresents a group or subgroup (such as women or people of color) will have a higher rate of error in identifying members of those groups or subgroups.

4.8     In or around February 2018, researchers from the Massachusetts Institute of Technology and Microsoft Research released the *Gender Shades* study.  In *Gender Shades*, the researchers analyzed three commercial facial recognition products and focused on each product's ability to accurately identify gender.  They noted that prior studies had shown that "machine learning algorithms can discriminate based on classes like race and gender.

---

[2] *See* Buolamwini and Gebru, *Gender Shades: Intersectional Accuracy Disparities in Commercial Gender Classification*, Proceedings of Mach. Learning Research 81:1-15, at 1 (2018), http://proceedings.mlr.press/v81/buolamwini18a/buolamwini18a .pdf ("*Gender Shades*").

COMPLAINT - 7

4.9    The *Gender Shades* study determined that each product more accurately classified males than females, and light-skinned individuals than dark-skinned individuals.  One product's error rate for classifying dark-skinned females was as high as 20.8%.  The researchers concluded that "most improvement is needed on darker females specifically.  More broadly, the error gaps between male and female classification along with lighter and darker classification should be closed."

4.10    In a follow up to *Gender Shades*, researchers examined the accuracy of Amazon's Rekognition biometric facial technology as compared to the technologies examined in the original study.  The updated study found that Rekognition had an error rate of 31.37% for identifying dark-skinned females, as opposed to an error rate of 0% with respect to identifying light-skinned males.[3]

4.11    In recent years, an "arms race" has developed amongst for-profit companies seeking to become market leaders in the facial recognition arena.  Critical to winning this battle has been the ability to claim a low identification error rate, in particular for these companies to herald the accuracy of their products, especially for identifying women and people of color.

**Flickr and IBM's Collection of Biometric Identifiers and Information**

4.12    Flickr, previously owned by Yahoo! Inc., is a photo-sharing website that had access to over 100 million photographs posted by its users.  In or around 2014, Flickr compiled these photographs into a single dataset (the "Flickr Dataset"), and made it publicly available.  However, Flickr did not inform or receive the consent of the individuals who uploaded the

---

[3] *See* Raji and Buolamwini, *Actionable Auditing: Investigating the Impact of Publicly Naming Biased Performance Results of Commercial AI Products*, Ass'n for the Advancement of Artificial Intelligence (2019), https://dam-prod.media.mit.edu/x/2019/01/24/AIES-19_paper_223.pdf.

photographs or those who appeared in the photographs.  Notably, the Flickr Dataset contained images of Illinois citizens and residents.

4.13    In the wake of the publication of the *Gender Shades* study, companies felt pressured to improve their accuracy of their facial recognition products and reduce the bias therein.  In or around January 2019, IBM announced the release of its Diversity in Faces—a new dataset consisting of one million images culled from the Flickr Dataset—for the purpose of improving the ability of facial recognition systems to fairly and accurately identify all individuals (the "Diversity in Faces Dataset.").[4]

4.14    In creating the Diversity in Faces Dataset, IBM scanned the facial geometry of each image and created a "comprehensive set of annotations of intrinsic facial features that includes craniofacial distances, areas and ratios, facial symmetry and contrast, skin color, age and gender predictions, subjective annotations, and pose and resolution."  Notably, IBM did not seek or receive permission from those who uploaded their photographs to Flickr to include their images in the Diversity in Faces Dataset, let alone to perform scans of their facial geometries or obtain or profit from their biometric identifiers and information.  In or around April 2019, IBM published a research report describing its Diversity in Faces Dataset and making clear that the dataset contained the biometric identifiers and information of each individual who appeared therein.[5]

---

[4] *See* John R. Smith, *IBM Research Releases "Diversity in Faces" Dataset to Advance Study of Fairness in Facial Recognition Systems*, IBM (Jan. 29, 2019), https://www.ibm.com/blogs/ research/2019/01/diversity-in-faces/.

[5] Michele Merler, et al., *Diversity in Faces*, IBM Research AI (Apr. 10, 2019), https://arxiv.org/pdf/1901.10436.pdf.

1        4.15    In addition, IBM made the Diversity in Faces Dataset available to other for-profit

2    companies that developed, produced, marketed, sold, or otherwise used facial recognition

3    products and technologies in connection with their businesses.  Once granted access by IBM,

4    the company seeking access had to download the Diversity in Faces Dataset through a link

5    provided by IBM.  This downloaded information included the biometric identifiers and

6    information extracted from each photograph in the dataset, and links to each photograph on

7    Flickr.  From the Flickr links, the companies were able to identify the Flickr user who uploaded

8    the photograph to Flickr, that user's homepage and other posted material, and each photograph's

9    metadata, including any available geo-tags relating to where the photograph was taken or

10   uploaded.

11   **Amazon Collects and Stores Biometric Data from Its Users**

12       4.16    Amazon's core facial recognition product is Rekognition, which launched in

13   November 2016.  Rekognition allows users to match new images of faces with existing, known

14   facial images "based on their visual geometry, including the relationship between the eyes, nose,

15   brow, mouth, and other facial features."  Rekognition is a cornerstone of many of Amazon's

16   largest consumer products and services, including its photo platform, Amazon Photos—its smart

17   home systems and cameras, and its virtual assistant technology, Alexa.

18       4.17    Amazon is also the largest provider of facial recognition technology to law

19   enforcement agencies.  The Company has marketed its Rekognition software to agencies such

20   as the U.S. Immigration and Customs Enforcement and the Federal Bureau of Investigation, to

21   monitor individuals they consider "people of interest."  Amazon has also partnered with more

22   than 1,300 law enforcement agencies, allowing them to use footage from their Ring home

23   security cameras in criminal investigations.  Amazon has expanded these efforts marketing their

24

COMPLAINT - 10

facial recognition software to government agencies despite warnings from consumers, employees, members of Congress, and stockholders.

4.18    In July 2018, the American Civil Liberties Union of Northern California ("ACLU") published the results of a study it conducted regarding Rekognition's accuracy.[6] According to the study, Rekognition incorrectly matched twenty-eight members of the U.S. Congress to people who had been arrested for a crime.  The false matches disproportionately involved people of color.  That summer, nearly seventy civil rights and research organizations wrote a letter to Amazon's Chief Executive Officer, Jeffrey P. Bezos ("Bezos"), demanding that Amazon stop providing facial recognition technology to governments.  In their letter, they called the Company to "stand up for civil rights and civil liberties," stating "Rekognition is a powerful surveillance system readily available to violate rights and target communities of color."  Amazon's own employees demanded the Company to stop selling its Rekognition facial recognition software to law enforcement, citing concerns over the "unique threat to civil rights and especially to the immigrants and people of color under attack by [President Donald J. Trump's] administration."[7]

4.19    Seeking to improve the accuracy of its facial recognition products and technologies, Amazon allegedly obtained IBM's Diversity in Faces Dataset after IBM made it available to for-profit companies in early 2019.  To do so, Amazon used the links provided by IBM to download or otherwise obtain from the Flickr Dataset each photograph in order to

---

[6] Jacob Snow, *Amazon's Face Recognition Falsely Matched 28 Members of Congress with Mugshots*, ACLU.org (July 26, 2018), https://www.aclu.org/blog/privacy-technology/surveillance-technologies/amazons-face-recognition-falsely-matched-28.

[7] Kate Conger, *Amazon Workers Demand Jeff Bezos Cancel Face Recognition Contracts with Law Enforcement*, GIZMODO (June 21, 2018), https://gizmodo.com/amazon-workers-demand-jeff-bezos-cancel-face-recognitio-1827037509.

COMPLAINT - 11

associate the biometric identifiers and information provided by IBM with the actual photographs to which the biometric data related. Amazon's collection and use of the Diversity in Faces Dataset allowed it to profit from such data by allowing Amazon to improve the effectiveness of its own facial recognition technology and products.

**Amazon's Collection and Storing of Biometric Data Violates BIPA**

4.20    In direct violation of BIPA, the Company stored its users' biometric information without informing them or securing their written consent. The Company has also failed to develop a written policy, made available to the public, establishing a retention schedule and guidelines for users to permanently destroy biometric identifiers when the initial purpose for collection has been satisfied. As such, the Company has violated the express language of BIPA.

4.21    These violations have exposed the Company to substantial harm. On July 14, 2020, a federal consumer class action lawsuit was filed on behalf of Amazon users in the U.S. District Court for the Western District of Washington alleging that Amazon unlawfully obtained and stored their biometrics information and identifiers (the "Consumer Class Action"). The Consumer Class Action asserted causes of action under section 14/15(b)-(c) of Chapter 740 of the Illinois Compiled Statutes. Specifically, the plaintiffs asserted that Amazon never informed them, by written notice or otherwise, that Amazon collected, stored, and used their biometric identifiers and information, or of the specific purpose and length of term for which their biometric identifiers were being collected, stored, and used. Nevertheless, when the plaintiffs uploaded photos to their accounts, Amazon extracted from those photos their biometric identifiers and stored them in its databases.

/ / /

/ / /

4.22    In a similar action concerning BIPA violations, Facebook, Inc. had to pay $650 million to settle the matter.[8]

## V.    THE COMPANY'S ANTICOMPETITIVE PRACTICES

5.1    Plaintiff is also seeking to investigate whether Amazon's fiduciaries authorized or allowed the Company to engage in anticompetitive practices, leading to U.S. and international regulatory scrutiny.  Amazon is one of the world's largest online marketplaces. Amazon has a dual role as an online platform: it sells products on its website as a retailer and also provides a marketplace where independent sellers can sell products directly to consumers. No other U.S. retailer operates a marketplace even close to the size of Amazon's.  Over the past few years, Amazon's market share in U.S. online commerce has increased to about 40%, which is about seven times more than the next competitor.

5.2    The Company makes and sells its own products to compete with brand names on its own platform.  Amazon's private-label business encompasses more than forty-five brands.

5.3    The Company currently faces significant regulatory inquiries into its practices, specifically over whether it unfairly uses its size and platform against competitors and other sellers on its site.  Amazon disputes that it abuses its power and size.

**The European Union Investigates the Company's Anticompetitive Practices**

5.4    In or around September 2018, the European Union's ("EU") top antitrust enforcer, the European Commission, began examining whether Amazon abused its dual role as a seller of its own products and a marketplace operator.[9]  The European Commission also

---

[8] *Patel v. Facebook, Inc.*, No. 3:15-cv-03747 (N.D. Cal.)

[9] This fact-finding mission stems from the European Commission's e-commerce sector inquiry into business practices that may restrict competition, beginning in May 2015.  The European Commission published its findings from the initial inquiry in May 2017.

examined whether the Company was gaining a competitive advantage from the data it gathers on third-party sellers, as Amazon continuously collects data about sellers' activity on its platform.

5.5    In September 2019, the European Commission opened a formal antitrust investigation to assess whether Amazon's use of sensitive data from independent sellers on its marketplace breached EU competition rules.   The EU has strict competition rules on anticompetitive agreements between companies and on the abuse of a dominant position. Commissioner Margrethe Vestager, in charge of competition policy, stated:

> European consumers are increasingly shopping online.  E-commerce has boosted retail competition and brought more choice and better prices. We need to ensure that large online platforms don't eliminate these benefits through anti-competitive behaviour. I have therefore decided to take a very close look at Amazon's business practices and its dual role as marketplace and retailer, to assess its compliance with EU competition rules.

5.6    As part of its investigation, the European Commission looked into the standard agreements between Amazon and marketplace sellers, which allow Amazon's retail business to analyze and use third-party seller data.  In particular, the European Commission focused on whether and how the use of accumulated marketplace seller data by Amazon as a retailer affects competition.  Based on the European Commission's preliminary fact-finding, Amazon appeared to use competitively sensitive information about marketplace sellers, their products, and transactions on the marketplace.

5.7    Recently, reports have surfaced that Amazon faces EU antitrust charges over its use of third-party seller data.[10]   The charges will reportedly accuse Amazon of using data

---

[10] *See* Jon Porter, *Amazon Reportedly Faces EU Antitrust Charges over Use of Third-Party Seller Data*, The Verge (June 11, 2020), https://www.theverge.com/2020/6/11/21287672/amazon-european-union-antitrust-charges-third-party-seller-data.

COMPLAINT - 14

gathered from sellers on its marketplace to compete against them.  Notably, Commissioner Vestager has previously fined major U.S. tech giants, including Google, Qualcomm, and Facebook, for their anticompetitive practices in Europe.

**The *Wall Street Journal* Exposes Amazon's Improper Use of Third-Party Seller Data**

5.8     On April 23, 2020, the *Wall Street Journal* (the "*WSJ*") published an article titled "Amazon Scooped Up Data from Its Own Sellers to Launch Competing Products."  The article described how the Company used data about independent sellers on its platform to develop competing products, in violation of its own policies.  Such proprietary information can help Amazon decide how to price an item, which features to copy, or whether to enter a product segment based on its earning potential.

5.9     The Company has claimed publicly that "we strictly prohibit our employees from using nonpublic, seller-specific data to determine which private label products to launch." Further, Amazon's associate general counsel has told Congress, "[w]e don't use individual seller data directly to compete" with businesses on the Company's platform.

5.10    In violation of these internal policies, however, the Company's employees used the collected proprietary information for Amazon's own benefit.  Although Amazon has stated it has restrictions in place to keep its private-label executives from accessing data on specific sellers in its marketplace, former employees admitted those rules were not uniformly enforced. In fact, according to some former employees, using such data was a common practice that was discussed openly in meetings they attended.  Former executives said they were told frequently by management that Amazon brands should make up more than 10% of retail sales by 2022. Managers of private-label product categories were told to create $1 billion businesses for their segments.

5.11    According to the *WSJ*, Company employees used the third-party sellers' data to launch and benefit Amazon products.  Some executives used proprietary information to research best-selling items they might want to compete against.  If access was restricted, managers would ask an Amazon business analyst to create reports featuring the information.

5.12    For instance, Amazon's employees accessed documents and data about a best-selling car-trunk organizer sold by a third-party vendor called Fortem.  Fortem is a four-person, Brooklyn-based company.  Fortem launched its trunk organizer on Amazon's marketplace in March 2016, and it eventually became the No. 1 seller in the category on Amazon.  The Company's report on Fortem, provided to the *WSJ* by an Amazon employee, included detailed information about Fortem's finances and operations, including total sales, how much the vendor paid Amazon for marketing and shipping, and how much Amazon made on each sale.  Fortem accounted for 99.95% of the total sales on Amazon for the trunk organizer for the period the documents cover, the data indicated.  The data in the Fortem report showed the product's average selling price during the preceding twelve months was approximately $25, that Fortem had sold more than $800,000 worth in the period specified, and that each item generated nearly $4 in profit for Amazon. The report also detailed how much Fortem spent on advertising per unit and the cost to ship each trunk organizer.  By knowing Amazon's profit-per-unit on the third-party item, Amazon's executives could ensure that prospective manufacturers could deliver a higher margin on an Amazon-branded competitor product before committing to it.

5.13    In October 2019, Amazon launched three trunk organizers similar to Fortem's under its AmazonBasics private-label brand.

5.14    According to the *WSJ's* source at Amazon, pulling data on competitors, even individual sellers, was "standard operating procedure" when making private-label products such

as electronics, suitcases, sporting goods, or other lines. Such reports were pulled before Amazon's private label decided to enter a product line, the person said.

**Congress Investigates the Company's Anticompetitive Practices**

5.15    In the wake of the *WSJ* article, on May 1, 2020, the U.S. House of Representatives sent a letter to Bezos seeking to investigate whether Amazon's previous statements made to the House Judiciary Committee (the "House Committee") about the Company's business practices were misleading or possibly criminally false or perjurious. Specifically, at a hearing on July 16, 2019, Amazon's Associate General Counsel Nate Sutton stated, "we do not use any seller data to compete with them." Additionally, Mr. Sutton testified, "we do not use their individual data when we're making decisions to launch private brands." Amazon has also submitted numerous written responses to the same effect to the House Committee.

5.16    Amazon responded to the *WSJ* report by describing its employees' conduct as a violation of its formal policy against the use of nonpublic, individual seller data. The House Committee, however, noted that the *WSJ* article "rais[ed] questions about whether executives implicitly encouraged or approved of this conduct even if it violated formal company policy."

5.17    The House Committee also noted that other investigative journalists, as well as preliminary findings of the European Commission, bolstered the allegations. If true, these allegations contradict the previous testimony and written responses that Amazon submitted to the House Committee.

5.18    On July 29, 2020, Bezos testified before members of the House Committee in a hearing on "Online Platforms and Market Power," but he said little to assuage concerns that Amazon's grip on online retail gives it the power to make or break small merchants. Much of

the questioning for Bezos focused on how Amazon competes against, and profits from, the 1.7 million small- and mid-sized merchants who sell products on its digital platform.  One concern was Amazon's use of data from its own merchants to help inform what products to develop under its own private-label brands.  As described herein, Amazon counsel's earlier statements to Congress concerning the use of data directly contradicted the investigative report of the *WSJ*.

5.19    During the hearing, Bezos stated the Company's investigation into the violations outlined in the *WSJ* report was ongoing.    Thus, the concern over these potentially anticompetitive practices remains unsettled.  In response, U.S. Representative Pramila Jayapal emphasized the House Committee's concerns: "So you might allow third-party sellers onto your platform.  But if you're monitoring the data to make sure that they're never going to get big enough that they can compete with you, that is the concern that the committee has."

5.20    The House Committee also questioned Bezos on the increasing cut of sales that Amazon takes from small merchants.  According to a recent study by the Institute for Local Self-Reliance ("ILSR")—a nonprofit that advocates for a strong economy built on independent businesses versus giant corporations—Amazon kept an average of 30% in fees in 2019 of each sale made by an independent seller.[11]  That number was up from 19% just five years earlier, according to the ILSR estimates.  Bezos defended these increases by stating that Amazon provides value to merchants in exchange for these fees by way of advertising.  Bezos, however, left open the question of whether small businesses on Amazon can be successful without giving the Company a larger cut of their earnings.

---

[11] Shay Mitchell, et al., *Amazon's Monopoly Tollbooth*, Inst. for Local Self Reliance (July 28, 2020), https://ilsr.org/amazons_tollbooth/.

COMPLAINT - 18

5.21     In addition, the House Committee questioned the frequency with which the Company <u>changes its policies</u> in ways that can make or break merchants' businesses, essentially overnight.   One Congress member told Bezos the story of a textbook seller on Amazon who says her business was kicked off of the platform without notice or explanation after her business had grown large.    Several independent sellers have complained about similar <u>arbitrary suspensions</u> by Amazon.

5.22     That same week, the House Committee published e-mails confirming the Company's aggressive price-cutting practices designed to undercut an emerging rival.[12] Specifically, Amazon rival Quidsi had gained traction in or around 2009 with a site called Diapers.com that sold baby supplies.   Amazon did not start selling diapers until a year after Diapers.com did because, at the time, diapers were seen as too bulky and low margin to be delivered profitably.   Quidsi, however, was able to optimize its operations to allow it to get cheaper and faster ground-shipping rates than Amazon.   In response to Quidsi's growth, the Company launched a price war, and then purchased Quidsi.

5.23     E-mails confirm that Quidsi's growth attracted the attention of Amazon executives.   One Amazon executive wrote in an e-mail obtained by the House Committee: "They are our biggest competitor in the diaper space.   ... They keep the pressure on pricing on us. They apparently have lower fulfillment costs than we have."   The executive added, "we need to match pricing on these guys no matter the cost."   By 2010, Quidsi had reached $300 million in revenue.

---

[12] *See* Timothy Lee, *Emails Detail Amazon's Plan to Crush a Startup Rival with Price Cuts*, ArsTechnica (July 30, 2020), https://arstechnica.com/tech-policy/2020/07/emails-detail-amazons-plan-to-crush-a-startup-rival-with-price-cuts/.

5.24    In June 2010, Quidsi announced the launch of a new site—Soap.com.  On June 8, Bezos sent an e-mail to his executives soliciting their thoughts on the rival.  One executive responded, "Given diapers.com's strength and competencies, soap.com is our most significant short-term competitor in the [health and personal care] space."  The executive added, "[w]e have already initiated a more aggressive 'plan to win' against diapers.com in the diaper/baby space."  In addition to offering "market leading pricing on diapers," Amazon was preparing to launch a new "Amazon Mom" program that offered parents deeper discounts on diapers and related products if customers signed up for a subscription.

5.25    Due to the deep discounts, Amazon experienced substantial losses from its price war with Quidsi.  During the hearing, one Congress member stated that internal documents obtained by the House Committee showed Amazon losing $200 million in a single month from diaper products.  Yet, in the released e-mails, Amazon's executives specifically listed the Amazon Mom rollout as part of Amazon's "aggressive 'plan to win' against diapers.com," adding, "to the extent this plan undercuts the core diapers business for diapers.com, it will slow the adoption of soap.com."  An internal e-mail in September 2010, discussed the price cuts Quidsi was forced to make to compete with the new Amazon Mom discounts. "They expect to lose lots of money in the next few yrs," wrote Amazon executive Peter Krawiec. "This will make it worse."

5.26    In November 2010, Quidsi reluctantly signed a merger agreement with Amazon. Immediately after the acquisition, Amazon began raising its diaper prices.  Indeed, one month after it announced the acquisition of Quidsi, Amazon closed the Amazon Mom program to new members.  Then a few weeks later, as the FTC was giving the deal unexpectedly close scrutiny,

Amazon reopened Amazon Mom, but with smaller discounts.  In effect, Amazon had hiked diaper prices soon after its acquisition of Quidsi.

5.27    The House Committee questioned whether Bezos had signed off on raising diaper prices after the acquisition.  Bezos pled ignorance.  "I don't remember that at all," he said. "We match competitive prices.  I believe we followed diapers.com."  Amazon shut Diapers.com down in 2017.

5.28    Recently, California and Washington state investigators have reportedly started examining the Company's business practices in their states.[13]  The inquiries will similarly focus on how Amazon treats third-party sellers in its online marketplace.

## VI.    THE INSPECTION DEMAND AND RELATED COMMUNICATIONS

6.1    Plaintiff sent the Inspection Demand on September 18, 2020, which Plaintiff sent under oath.  Plaintiff enclosed with the Inspection Demand a copy of her recent brokerage statement, appropriately redacted to remove sensitive information.  Even with these appropriate redactions, the brokerage statement clearly identified Plaintiff as an owner of the account and listed Amazon as one of her holdings.

6.2    The Inspection Demand detailed the events described above and explained that Plaintiff was investigating potential breaches of duty, corporate mismanagement, wrongdoing, and unjust enrichment by fiduciaries of the Company.  The Inspection Demand explained that after reviewing the demanded books and records, Plaintiff would take appropriate action, including potentially: (i) presenting a litigation demand to Amazon's Board; (ii) suggesting

---

[13] *See* Weise and McCabe, *Amazon Said to Be Under Scrutiny in 2 States for Abuse of Power*, N.Y. Times (June 12, 2020), https://www.nytimes.com/2020/06/12/technology/state-inquiry-antitrust-amazon.html.

COMPLAINT - 21

corporate governance reforms to the Board; or (iii) filing a derivative action in lieu of making a demand, if she deems such demand futile.

6.3     Plaintiff demanded to inspect narrowly tailored categories of Amazon's books and records related to the Company's improper statements and possible mismanagement.   In particular, the Inspection Demand sought:

1. The Board books and records, including any minutes, resolutions, reports, presentations, or memoranda made, reviewed by, or provided to the Board, concerning:

   a. the Company's biometrics identifier collection processes, including, without limitation, its facial recognition software, from November 1, 2016 to the present;

   b. Rekognition, including, without limitation, the Company's use of the Diversity in Faces Dataset, from November 1, 2016 to the present;

   c. any laws concerning the collection or use of biometric information, including, without limitation, BIPA;

   d. the Company's collection and use of third-party seller data to develop competing products;

   e. Quidsi, from January 1, 2009 to November 8, 2010;

   f. any investigation concerning anticompetitive conduct by the Company, including, but not limited to, the EU's investigation into the Company's anticompetitive practices, Congress' investigation into the Company's anticompetitive practices; and California and Washington's investigation into the Company's anticompetitive practices; and

   g. the *WSJ* article published on October 23, 2020, titled "Amazon Scooped Up Data from Its Own Sellers to Launch Competing Products."

2. The communications to or from the Board concerning the topics in Demand No. 1.

3. Books and records sufficient to identify all Company internal controls, policies, and procedures in place to ensure Amazon's financial standing are adequately and timely reported to management and the Board.

4. Books and records sufficient to identify all Company internal controls, policies, and procedures in place to ensure Amazon's compliance with privacy laws are adequately and timely reported to management and the Board.

5. Books and records sufficient to identify all Company internal controls, policies, and procedures in place to ensure Amazon's compliance with antitrust laws are adequately and timely reported to management and the Board.

6. Books and records sufficient to determine director independence, including the books and records concerning any related-party transaction and any director independence questionnaires.

7. Documents provided in response to any other Section 220 demands investigating the same or similar matters identified in this demand.

6.4     Amazon received the Inspection Demand on September 23, 2020.

6.5     Amazon responded to Plaintiff's Inspection Demand on October 19, 2020. Amazon argued, briefly, in the letter that the Inspection Demand did not state a credible basis and that Plaintiff's requests for inspection were overbroad.  However, Amazon invited Plaintiff to meet and confer with the Company to see if they could achieve a mutually agreeable resolution.

6.6     Plaintiff accepted Amazon's offer and attempted to meet and confer with the Company.  However, Amazon never stated what books and records it was willing to produce. Instead, it stated that Plaintiff had to agree to an exclusive forum that would limit the only venue Plaintiff could use the requested books and records to Delaware.

6.7     Plaintiff rightfully balked at this draconian restriction.   She pointed to on-point case law that stated that an investor must be able to use the documents if he needs to intervene in any other pending case, regardless of the jurisdiction, in order to protect his rights.  Plaintiff also referred Amazon to recent Delaware Supreme Court decisions that advised such use

COMPLAINT - 23

restrictions were improper outside of exceptional circumstances, which did not apply here.   As pointed out by Plaintiff, Amazon did not even have an exclusive forum provision.

6.8     Plaintiff and Amazon engaged in multiple meet and confers about this clause. At no point did Amazon ever offer to allow Plaintiff to inspect any set of books and records.  Then, Amazon went silent.  Now, nearly six months have passed since Plaintiff sent her demand and she still has not been able to review a single document.

6.9     Accordingly, it is apparent that without Court intervention, Amazon will continue to refuse Plaintiff's right to inspection.

## VII.   CAUSE OF ACTION

### (Demand for Inspection Pursuant to Section 220)

7.1     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

7.2     Plaintiff made a written demand upon Amazon for the inspection of the books, records, and documents set forth in the Inspection Demand.

7.3     Plaintiff has complied fully with all requirements under Section 220 respecting the form and manner of making a demand for inspection of Amazon's books, records, and documents.

7.4     Plaintiff's Inspection Demand is for a proper purpose.

7.5     Amazon has not provided Plaintiff with access, or agreed to provide her with access, to the demanded books and records.

7.6     By reason of the foregoing and pursuant to Section 220, Plaintiff is entitled to an order permitting her to inspect and make copies of the books and records, as identified in the Inspection Demand and herein.

1

## VIII.   PRAYER FOR RELIEF

2      WHEREFORE, Plaintiff demands judgment in her favor and prays for relief as follows:

3      A.      That the Court summarily order Amazon to produce to Plaintiff and/or her

4 designees the books and records as detailed herein and in the Inspection Demand;

5      B.      That the Court award Plaintiff her costs and expenses, including reasonable

6 attorneys' fees, in connection with this Section 220 action; and

7      C.      That Plaintiff be awarded such other and further relief as is just.

8
      **DATED** this 18th day of March, 2021.

9
                                    STRITMATTER KESSLER KOEHLER MOORE

10

11                                  /s/ Brad J. Moore
                                    Brad J. Moore, WSBA #21802
12                                  3600 15th Avenue West #300
                                    Seattle, WA 98119
13                                  Telephone: (206) 448-1777
                                    Facsimile: (206) 728-2131
14                                  E-mail: brad@stritmatter.com

15                                  ROBBINS LLP
                                    Brian J. Robbins
16                                  Stephen J. Oddo
                                    Eric M. Carrino
17                                  5040 Shoreham Place
                                    San Diego, CA 92122
18                                  Telephone: (619) 525-3990
                                    Facsimile: (619) 525-3991
19                                  E-mail: brobbins@robbinsllp.com
                                            soddo@robbinsllp.com
20                                          ecarrino@robbinsllp.com
                                    Attorneys for Plaintiff

21

22

23

24

COMPLAINT - 25

# Exhibit A



5040 Shoreham Place
San Diego, CA 92122
619.525.3990 *phone*
619.525.3991 *fax*
www.robbinsllp.com

September 22, 2020

**VIA FEDEX OVERNIGHT**

Jeffrey P. Bezos, Chairman and Chief Executive Officer
AMAZON.COM, INC.
410 Terry Avenue North
Seattle, WA 98109-5210

      **Re:    Amazon.com, Inc. Stockholder Inspection Demand**

Dear Mr. Bezos:

      We represent Michele Rosati, a stockholder of Amazon.com, Inc. ("Amazon" or the "Company"). We write on our client's behalf to demand that the Company permit Ms. Rosati, through her legal counsel, to inspect certain books and records of Amazon, pursuant to title 8, section 220 of the Delaware General Corporation Law Code ("Section 220"). Our client has authorized Robbins LLP to inspect the Company's books and records on her behalf.

      Ms. Rosati brings this demand for a proper purpose as required under Delaware law. Our client's proper purpose is to investigate potential corporate mismanagement, wrongdoing, and waste by fiduciaries of the Company, including the Board of Directors (the "Board") and executive officers of Amazon, in connection with the Company's violations of state privacy laws and its anticompetitive practices. Once our client has reviewed the requested information she will take appropriate action, including potentially: (i) presenting a litigation demand to the Board; (ii) suggesting corporate governance reforms; or (iii) filing a derivative action in lieu of making a litigation demand, if she deems such demand futile.

**THE COMPANY'S UNAUTHORIZED COLLECTION OF INDIVIDUALS'
INFORMATION VIOLATES STATE PRIVACY LAWS**

**Biometrics and Facial Recognition Technology**

      Biometrics is the technical term for measurements used to identify people's unique physical characteristics. Examples of biometric identifiers include an individual's DNA, fingerprints, irises or retinas, voiceprints, and facial geometry. The uniqueness and potential permanence of biometric identifiers present an advantage for businesses to accurately identify and distinguish individuals. Businesses presently use biometrics in a wide variety of applications, including data collection.

      One technological application of biometrics is facial recognition software. Facial recognition software uses biometrics to map facial features from a photograph or video. In particular, the software uses an algorithm that calculates a unique digital representation of the face based on the geometric relationship of a person's facial features (such as the distance between their



eyes, ears, and nose), creating a face signature or map. The software then compares the information with a database of known faces to find a match.

Facial recognition technology has seen steady improvement over the past decade. Lower costs and increased accuracy have allowed companies such as Amazon to deploy increasingly sophisticated facial recognition software in their applications. However, this increased sophistication has raised serious privacy concerns. Biometrics present potential privacy threats to the individual if compromised, such as a heightened risk for identity theft. During a U.S. Senate hearing in 2012 on the use of facial recognition technology, Senator Al Franken noted that "[o]nce someone has your faceprint, they can get your name, they can find your social networking account, and they can find and track you in the street, in the stores that you visit, the Government buildings you enter, and the photos your friends post online." He added, "facial recognition technology can allow others to access all of that information from a distance, without your knowledge and in about as much time as it takes to snap a photo." Faceprints can even be used to identify protesters at political rallies and "target them for selective jailing and prosecution, stifling their First Amendment rights."

The U.S. Federal Trade Commission ("FTC") has also noted the public's concerns over privacy in social networks that "databases of photos or biometric data may be susceptible to breaches and hacking." The FTC urged companies using facial recognition technology to ask for consent ***before*** collecting biometric information from a photo. In its best practices guidelines, the FTC addressed social networks in particular, stating, "before using facial recognition to identify an individual it could not otherwise identify, the company should obtain the affirmative express consent of the individual in the image."

**The Illinois Biometric Information Privacy Act**

In 2008, the Illinois General Assembly enacted the Illinois Biometric Information Privacy Act ("BIPA") to enhance the state's "limited State law regulating the collection, use, safeguarding, and storage of biometrics[.]" 740 Ill. Comp. Stat. §14/5(e). BIPA defines a "biometric identifier" as including a "scan of hand or face geometry." 740 Ill. Comp. Stat. §14/10. The legislature noted that "[b]iometrics are unlike other unique identifiers that are used to access finances or other sensitive information," because while social security numbers can be changed if compromised, biometric data are "biologically unique to the individual," and "once compromised, the individual has no recourse, is at heightened risk for identity theft, and is likely to withdraw from biometric-facilitated transactions." 740 Ill. Comp. Stat. §14/5(c).

Under BIPA, companies must have a public, written policy establishing a retention schedule for biometric identifiers and information and guidelines for their permanent destruction. Moreover, a company may not collect or otherwise obtain a person or a customer's biometric identifier or biometric information without informing the subject in writing and securing a written release. Nor may a company profit from an individual's biometric identifiers and information. In particular, section 14/15(a)-(c) of BIPA provides:

a)       A private entity in possession of biometric identifiers or biometric information must develop a written policy, made available to the public, establishing a retention schedule and guidelines for permanently destroying biometric identifiers and biometric information when the initial purpose for collecting or obtaining such identifiers or information has been satisfied or within 3 years of the individual's last interaction with the private entity, whichever occurs first.    Absent a valid warrant or subpoena issued by a court of competent jurisdiction, a private entity in possession of biometric identifiers or biometric information must comply with its established retention schedule and destruction guidelines.

b)       No private entity may collect, capture, purchase, receive through trade, or otherwise obtain a person's or a customer's biometric identifier or biometric information, unless it first:

   1)   informs the subject or the subject's legally authorized representative in writing that a biometric identifier or biometric information is being collected or stored;

   2)   informs the subject or the subject's legally authorized representative in writing of the specific purpose and length of term for which a biometric identifier or biometric information is being collected, stored, and used; and

   3)   receives a written release executed by the subject of the biometric identifier or biometric information or the subject's legally authorized representative.

c)       No private entity in possession of a biometric identifier or biometric information may sell, lease, trade, or otherwise profit from a person's or a customer's biometric identifier or biometric information.

**The Gender Shades Study**

Facial recognition software algorithms that are trained with biased data can result in algorithmic discrimination.[1]  This, in turn, can lead to facial recognition products that are less effective at identifying certain types of faces.  For example, an algorithm trained on dataset that underrepresents a group or subgroup (such as women or people of color) will have a higher rate of error in identifying members of those groups or subgroups.

In or around February 2018, researchers from the Massachusetts Institute of Technology and Microsoft Research released the *Gender Shades* study.  In *Gender Shades*, the researchers analyzed three commercial facial recognition products and focused on each product's ability to

---

[1] *See* Buolamwini and Gebru, *Gender Shades: Intersectional Accuracy Disparities in Commercial Gender Classification*, Proceedings of Mach. Learning Research 81:1-15, at 1 (2018), http://proceedings.mlr.press/v81/buolamwini18a/buolamwini18a .pdf ("*Gender Shades*").

*Amazon.com, Inc. Stockholder Inspection Demand*
Page 4

accurately identify gender.  They noted that prior studies had shown that "machine learning algorithms can discriminate based on classes like race and gender."

The *Gender Shades* study determined that each product more accurately classified males than females, and light-skinned individuals than dark-skinned individuals.  One product's error rate for classifying dark-skinned females was as high as 20.8%.  The researchers concluded that "most improvement is needed on darker females specifically.  More broadly, the error gaps between male and female classification along with lighter and darker classification should be closed."

In a follow up to *Gender Shades*, researchers examined the accuracy of Amazon's Rekognition biometric facial technology as compared to the technologies examined in the original study.  The updated study found that Rekognition had an error rate of 31.37% for identifying dark-skinned females, as opposed to an error rate of 0% with respect to identifying light-skinned males.[2]

In recent years, an "arms race" has developed amongst for-profit companies seeking to become market leaders in the facial recognition arena.  Critical to winning this battle has been the ability to claim a low identification error rate, in particular for these companies to herald the accuracy of their products, especially for identifying women and people of color.

### Flickr and IBM's Collection of Biometric Identifiers and Information

Flickr, previously owned by Yahoo! Inc., is a photo-sharing website that had access to over 100 million photographs posted by its users.  In or around 2014, Flickr compiled these photographs into a single dataset (the "Flickr Dataset"), and made it publicly available.  However, Flickr did not inform or receive the consent of the individuals who uploaded the photographs or those who appeared in the photographs.  Notably, the Flickr Dataset contained images of Illinois citizens and residents.

In the wake of the publication of the *Gender Shades* study, companies felt pressured to improve their accuracy of their facial recognition products and reduce the bias therein.  In or around January 2019, International Business Machines Corporation ("IBM") announced the release of it Diversity in Faces—a new dataset consisting of one million images culled from the Flickr Dataset—for the purpose of improving the ability of facial recognition systems to fairly and accurately identify all individuals (the "Diversity in Faces Dataset.").[3]

---

[2] *See* Raji and Buolamwini, *Actionable Auditing: Investigating the Impact of Publicly Naming Biased Performance Results of Commercial AI Products*, Ass'n for the Advancement of Artificial Intelligence (2019), https://dam-prod.media.mit.edu/x/2019/01/24/AIES-19_paper_223.pdf.

[3] *See* John R. Smith, *IBM Research Releases "Diversity in Faces" Dataset to Advance Study of Fairness in Facial Recognition Systems*, IBM (Jan. 29, 2019), https://www.ibm.com/blogs/research/2019/01/diversity-in-faces/.

In creating the Diversity in Faces Dataset, IBM scanned the facial geometry of each image and created a "comprehensive set of annotations of intrinsic facial features that includes craniofacial distances, areas and ratios, facial symmetry and contrast, skin color, age and gender predictions, subjective annotations, and pose and resolution." Notably, IBM did not seek or receive permission from those who uploaded their photographs to Flickr to include their images in the Diversity in Faces Dataset, let alone to perform scans of their facial geometries or obtain or profit from their biometric identifiers and information. In or around April 2019, IBM published a research report describing its Diversity in Faces Dataset and making clear that the dataset contained the biometric identifiers and information of each individual who appeared therein.[4]

In addition, IBM made the Diversity in Faces Dataset available to other for-profit companies that developed, produced, marketed, sold, or otherwise used facial recognition products and technologies in connection with their businesses. Once granted access by IBM, the company seeking access had to download the Diversity in Faces Dataset through a link provided by IBM. This downloaded information included the biometric identifiers and information extracted from each photograph in the dataset, and links to each photograph on Flickr. From the Flickr links, the companies were able to identify the Flickr user who uploaded the photograph to Flickr, that user's homepage and other posted material, and each photograph's metadata, including any available geo-tags relating to where the photograph was taken or uploaded.

**Amazon Collects and Stores Biometric Data from Its Users**

Amazon's core facial recognition product is Rekognition, which launched in November 2016. Rekognition allows users to match new images of faces with existing, known facial images "based on their visual geometry, including the relationship between the eyes, nose, brow, mouth, and other facial features." Rekognition is a cornerstone of many of Amazon's largest consumer products and services, including its photo platform, Amazon Photos—its smart home systems and cameras, and its virtual assistant technology, Alexa.

Amazon is also the largest provider of facial recognition technology to law enforcement agencies. The Company has marketed its Rekognition software to agencies such as the U.S. Immigration and Customs Enforcement and the Federal Bureau of Investigation, to monitor individuals they consider "people of interest." Amazon has also partnered with more than 1,300 law enforcement agencies, allowing them to use footage from their Ring home security cameras in criminal investigations. Amazon has expanded these efforts marketing their facial recognition software to government agencies despite warnings from consumers, employees, members of Congress, and stockholders.

---

[4] Michele Merler, et al., *Diversity in Faces*, IBM Research AI (Apr. 10, 2019), https://arxiv.org/pdf/1901.10436.pdf.

In July 2018, the American Civil Liberties Union of Northern California ("ACLU") published the results of a study it conducted regarding Rekognition's accuracy.[5]   According to the study, Rekognition incorrectly matched twenty-eight members of the U.S. Congress to people who had been arrested for a crime.  The false matches disproportionately involved people of color.  That summer, nearly seventy civil rights and research organizations wrote a letter to Amazon's Chief Executive Officer, Jeffrey P. Bezos ("Bezos"), demanding that Amazon stop providing facial recognition technology to governments.  In their letter, they called the Company to "stand up for civil rights and civil liberties," stating "Rekognition is a powerful surveillance system readily available to violate rights and target communities of color."  Amazon's own employees demanded the Company to stop selling its Rekognition facial recognition software to law enforcement, citing concerns over the "unique threat to civil rights and especially to the immigrants and people of color under attack by [President Donald J. Trump's] administration."[6]

Seeking to improve the accuracy of its facial recognition products and technologies, Amazon allegedly obtained IBM's Diversity in Faces Dataset after IBM made it available to for-profit companies in early 2019.  To do so, Amazon used the links provided by IBM to download or otherwise obtain from the Flickr Dataset each photograph in order to associate the biometric identifiers and information provided by IBM with the actual photographs to which the biometric data related.  Amazon's collection and use of the Diversity in Faces Dataset allowed it to profit from such data by allowing Amazon to improve the effectiveness of its own facial recognition technology and products.

**Amazon's Collection and Storing of Biometric Data Violates BIPA**

In direct violation of BIPA, the Company stored its users' biometric information without informing them or securing their written consent.  The Company has also failed to develop a written policy, made available to the public, establishing a retention schedule and guidelines for users to permanently destroy biometric identifiers when the initial purpose for collection has been satisfied.  As such, the Company has violated the express language of BIPA.

These violations have exposed the Company to substantial harm.  On July 14, 2020, a federal consumer class action lawsuit was filed on behalf of Amazon users in the U.S. District Court for the Western District of Washington alleging that Amazon unlawfully obtained and stored their biometrics information and identifiers (the "Consumer Class Action").  The Consumer Class Action asserted causes of action under section 14/15(b)-(c) of Chapter 740 of the Illinois Compiled Statutes.  Specifically, the plaintiffs asserted that Amazon never informed them, by written notice or otherwise, that Amazon collected, stored, and used their biometric identifiers and information,

---

[5] Jacob Snow, *Amazon's Face Recognition Falsely Matched 28 Members of Congress with Mugshots*, ACLU.org (July 26, 2018), https://www.aclu.org/blog/privacy-technology/surveillance-technologies/amazons-face-recognition-falsely-matched-28.

[6] Kate Conger, *Amazon Workers Demand Jeff Bezos Cancel Face Recognition Contracts with Law Enforcement*, GIZMODO (June 21, 2018), https://gizmodo.com/amazon-workers-demand-jeff-bezos-cancel-face-recognitio-1827037509.

or of the specific purpose and length of term for which their biometric identifiers were being collected, stored, and used. Nevertheless, when the plaintiffs uploaded photos to their accounts, Amazon extracted from those photos their biometric identifiers and stored them in its databases.

Our client is concerned that Amazon's fiduciaries are responsible for violating state laws designed to protect individuals' biometric information and privacy. Our client is also concerned that the Company lacked adequate and effective internal controls over its privacy protection procedures before this revelation.

## THE COMPANY'S ANTICOMPETITIVE PRACTICES
## LEAD TO REGULATORY SCRUTINY

Our client is also concerned that Amazon's fiduciaries have authorized or allowed the Company to engage in anticompetitive practices, leading to U.S. and international regulatory scrutiny. Amazon is one of the world's largest online marketplaces. Amazon has a dual role as an online platform: it sells products on its website as a retailer and also provides a marketplace where independent sellers can sell products directly to consumers. No other U.S. retailer operates a marketplace even close to the size of Amazon's. Over the past few years, Amazon's market share in U.S. online commerce has increased to about 40%, which is about seven times more than the next competitor.

The Company makes and sells its own products to compete with brand names on its own platform. Amazon's private-label business encompasses more than forty-five brands. Those brands account for 1% of its $158 billion in annual retail sales, not counting Amazon's devices such as its Echo speakers, Kindle e-readers, and Ring doorbell cameras.

Currently, the COVID-19 pandemic has enabled Amazon to position itself as a national resource capable of delivering needed goods to Americans sheltering in place, garnering it some goodwill in Washington, D.C. The Company continues, however, to face regulatory inquiries into its practices that predate the crisis, specifically over whether it unfairly uses its size and platform against competitors and other sellers on its site. Amazon disputes that it abuses its power and size.

### The European Union Investigates the Company's Anticompetitive Practices

In or around September 2018, the European Union's ("EU") top antitrust enforcer, the European Commission, began examining whether Amazon abused its dual role as a seller of its own products and a marketplace operator.[7] The European Commission also examined whether the Company was gaining a competitive advantage from the data it gathers on third-party sellers, as Amazon continuously collects data about sellers' activity on its platform.

---

[7] This fact-finding mission stems from the European Commission's e-commerce sector inquiry into business practices that may restrict competition, beginning in May 2015. The European Commission published its findings from the initial inquiry in May 2017.

*Amazon.com, Inc. Stockholder Inspection Demand*
Page 8

In September 2019, the European Commission opened a formal antitrust investigation to assess whether Amazon's use of sensitive data from independent sellers on its marketplace breached EU competition rules.  EU has strict competition rules on anticompetitive agreements between companies and on the abuse of a dominant position.  Commissioner Margrethe Vestager, in charge of competition policy, stated:

> European consumers are increasingly shopping online.  E-commerce has boosted retail competition and brought more choice and better prices. We need to ensure that large online platforms don't eliminate these benefits through anti-competitive behaviour. I have therefore decided to take a very close look at Amazon's business practices and its dual role as marketplace and retailer, to assess its compliance with EU competition rules.

As part of its investigation, the European Commission looked into the standard agreements between Amazon and marketplace sellers, which allow Amazon's retail business to analyze and use third-party seller data.  In particular, the European Commission focused on whether and how the use of accumulated marketplace seller data by Amazon as a retailer affects competition.  Based on the European Commission's preliminary fact-finding, Amazon appeared to use competitively sensitive information about marketplace sellers, their products, and transactions on the marketplace.

Recently, reports have surfaced that Amazon faces EU antitrust charges over its use of third-party seller data.[8]  The charges will reportedly accuse Amazon of using data gathered from sellers on its marketplace to compete against them.   Notably, Commissioner Vestager has previously fined major U.S. tech giants, including Google, Qualcomm, and Facebook, for their anticompetitive practices in Europe.

**The *Wall Street Journal* Exposes Amazon's Improper Use of Third-Party Seller Data**

Amazon has a history of difficult relationships with independent sellers.  While some of the issues have involved counterfeit goods or lack of pricing control on their products, some have expressed concern that Amazon uses data it accumulates through its platform to copy third-party sellers' products and siphon sales.

On April 23, 2020, the *Wall Street Journal* (the "*WSJ*") published an article titled "Amazon Scooped Up Data from Its Own Sellers to Launch Competing Products."  The article described how the Company used data about independent sellers on its platform to develop competing products, in violation of its own policies.  Such proprietary information can help Amazon decide how to price an item, which features to copy, or whether to enter a product segment based on its earning potential.

---

[8] *See* Jon Porter, *Amazon Reportedly Faces EU Antitrust Charges over Use of Third-Party Seller Data*, The Verge (June 11, 2020), https://www.theverge.com/2020/6/11/21287672/amazon-european-union-antitrust-charges-third-party-seller-data.

Amazon "has long asserted, including to Congress, that when it makes and sells its own products, it doesn't use information it collects from the site's individual third-party sellers—data those sellers view as proprietary." In a written statement, Amazon also stated, "we strictly prohibit our employees from using nonpublic, seller-specific data to determine which private label products to launch." Further, Amazon's associate general counsel has told Congress, "[w]e don't use individual seller data directly to compete" with businesses on the Company's platform.

In violation of these internal policies, however, the Company's employees used the collected proprietary information for Amazon's own benefit. Although Amazon has stated it has restrictions in place to keep its private-label executives from accessing data on specific sellers in its marketplace, former employees admitted those rules were not uniformly enforced. In fact, according to some former employees, using such data was a common practice that was discussed openly in meetings they attended. Former executives said they were told frequently by management that Amazon brands should make up more than 10% of retail sales by 2022. Managers of private-label product categories were told to create $1 billion businesses for their segments.

According to the *WSJ*, Company employees used the third-party sellers' data to launch and benefit Amazon products. Some executives used proprietary information to research best-selling items they might want to compete against. If access was restricted, managers would ask an Amazon business analyst to create reports featuring the information.

For instance, Amazon's employees accessed documents and data about a best-selling car-trunk organizer sold by a third-party vendor called Fortem. Fortem is a four-person, Brooklyn-based company. Fortem launched its trunk organizer on Amazon's marketplace in March 2016, and it eventually became the No. 1 seller in the category on Amazon. The Company's report on Fortem, provided to the *WSJ* by an Amazon employee, included detailed information about Fortem's finances and operations, including total sales, how much the vendor paid Amazon for marketing and shipping, and how much Amazon made on each sale. Fortem accounted for 99.95% of the total sales on Amazon for the trunk organizer for the period the documents cover, the data indicated. The data in the Fortem report showed the product's average selling price during the preceding twelve months was approximately $25, that Fortem had sold more than $800,000 worth in the period specified, and that each item generated nearly $4 in profit for Amazon. The report also detailed how much Fortem spent on advertising per unit and the cost to ship each trunk organizer. By knowing Amazon's profit-per-unit on the third-party item, Amazon's executives could ensure that prospective manufacturers could deliver a higher margin on an Amazon-branded competitor product before committing to it.

In October 2019, Amazon launched three trunk organizers similar to Fortem's under its AmazonBasics private-label brand.

According to the *WSJ's* source at Amazon, pulling data on competitors, even individual sellers, was "standard operating procedure" when making private-label products such as electronics, suitcases, sporting goods, or other lines. Such reports were pulled before Amazon's private label decided to enter a product line, the person said. Investment firm SunTrust Robinson

*Amazon.com, Inc. Stockholder Inspection Demand*
Page 10

Humphrey estimates Amazon is on track to post $31 billion in private-label sales by 2022, or nearly double competitor retailer Nordstrom Inc.'s 2019 revenues.

**Congress Investigates the Company's Anticompetitive Practices**

In the wake of the *WSJ* article, on May 1, 2020, the U.S. House of Representatives sent a letter to Bezos seeking to investigate whether Amazon's previous statements made to the House Judiciary Committee (the "House Committee") about the Company's business practices were misleading or possibly criminally false or perjurious. Specifically, at a hearing on July 16, 2019, Amazon's Associate General Counsel Nate Sutton stated "we do not use any seller data to compete with them." Additionally, Mr. Sutton testified, "[W]e do not use their individual data when we're making decisions to launch private brands." Amazon has also submitted numerous written responses to the same effect to the House Committee.

Amazon responded to the *WSJ* report by describing its employees' conduct as a violation of its formal policy against the use of nonpublic, individual seller data. The House Committee, however, noted that the *WSJ* article "rais[ed] questions about whether executives implicitly encouraged or approved of this conduct even if it violated formal company policy."

The House Committee also noted that other investigative journalists, as well as preliminary findings of the European Commission, bolstered the allegations. If true, these allegations contradict the previous testimony and written responses that Amazon submitted to the House Committee.

On July 29, 2020, Bezos testified before members of the House Committee in a hearing on "Online Platforms and Market Power," but he said little to assuage concerns that Amazon's grip on online retail gives it the power to make or break small merchants. Much of the questioning for Bezos focused on how Amazon competes against, and profits from, the 1.7 million small- and mid-sized merchants who sell products on its digital platform. One concern was Amazon's use of data from its own merchants to help inform what products to develop under its own private-label brands. As described herein, Amazon counsel's earlier statements to Congress concerning the use of data directly contradicted the investigative report of the *WSJ*.

During the hearing, Bezos stated the Company's investigation into the violations outlined in the *WSJ* report was ongoing. Thus, the concern over these potentially anticompetitive practices remains unsettled. In response, U.S. Representative Pramila Jayapal emphasized the House Committee's concerns: "So you might allow third-party sellers onto your platform. But if you're monitoring the data to make sure that they're never going to get big enough that they can compete with you, that is the concern that the committee has."

The House Committee also questioned Bezos on the increasing cut of sales that Amazon takes from small merchants. According to a recent study by the Institute for Local Self-Reliance ("ILSR")—a nonprofit that advocates for a strong economy built on independent businesses versus giant corporations—Amazon kept an average of 30% in fees in 2019 of each sale made by an

independent seller.[9]  That number was up from 19% just five years earlier, according to the ILSR estimates.  Bezos defended these increases by stating that Amazon provides value to merchants in exchange for these fees by way of advertising.  Bezos, however, left open the question of whether small businesses on Amazon can be successful without giving the Company a larger cut of their earnings.

In addition, the House Committee questioned the frequency with which the Company changes its policies in ways that can make or break merchants' businesses, essentially overnight.  One Congress member told Bezos the story of a textbook seller on Amazon who says her business was kicked off of the platform without notice or explanation after her business had grown large.  Several independent sellers have complained about similar arbitrary suspensions by Amazon.

That same week, the House Committee published e-mails confirming the Company's aggressive price-cutting practices designed to undercut an emerging rival.[10]  Specifically, Amazon rival Quidsi had gained traction in or around 2009 with a site called Diapers.com that sold baby supplies. Amazon did not start selling diapers until a year after Diapers.com did because, at the time, diapers were seen as too bulky and low-margin to be delivered profitably.  Quidsi, however, was able to optimize its operations to allow it to get cheaper and faster ground-shipping rates than Amazon.  In response to Quidsi's growth, the Company launched a price war, and then purchased Quidsi.

E-mails confirm that Quidsi's growth attracted the attention of Amazon executives.  One Amazon executive wrote in an e-mail obtained by the House Committee: "They are our biggest competitor in the diaper space. ... They keep the pressure on pricing on us. They apparently have lower fulfillment costs than we have."  The executive added, "we need to match pricing on these guys no matter the cost."  By 2010, Quidsi had reached $300 million in revenue.

In June 2010, Quidsi announced the launch of a new site—Soap.com.  On June 8, Bezos sent an e-mail to his executives soliciting their thoughts on the rival.  One executive responded, "Given diapers.com's strength and competencies, soap.com is our most significant short-term competitor in the [health and personal care] space."  The executive added, "[w]e have already initiated a more aggressive 'plan to win' against diapers.com in the diaper/baby space."  In addition to offering "market leading pricing on diapers," Amazon was preparing to launch a new "Amazon Mom" program that offered parents deeper discounts on diapers and related products if customers signed up for a subscription.

---

[9] Shay Mitchell, et al., *Amazon's Monopoly Tollbooth*, Inst. for Local Self Reliance (July 28, 2020), https://ilsr.org/amazons_tollbooth/.

[10] *See* Timothy Lee, *Emails Detail Amazon's Plan to Crush a Startup Rival with Price Cuts*, ArsTechnica (July 30, 2020), https://arstechnica.com/tech-policy/2020/07/emails-detail-amazons-plan-to-crush-a-startup-rival-with-price-cuts/.

*Amazon.com, Inc. Stockholder Inspection Demand*
Page 12

Due to the deep discounts, Amazon experienced substantial losses from its price war with Quidsi. During the hearing, one Congress member stated that internal documents obtained by the House Committee showed Amazon losing $200 million in a single month from diaper products. Yet, in the released e-mails, Amazon's executives specifically listed the Amazon Mom rollout as part of Amazon's "aggressive 'plan to win' against diapers.com," adding, "to the extent this plan undercuts the core diapers business for diapers.com, it will slow the adoption of soap.com." An internal e-mail in September 2010, discussed the price cuts Quidsi was forced to make to compete with the new Amazon Mom discounts. "They expect to lose lots of money in the next few yrs," wrote Amazon executive Peter Krawiec. "This will make it worse."

In November 2010, Quidsi reluctantly signed a merger agreement with Amazon. Immediately after the acquisition, Amazon began raising its diaper prices. Indeed, one month after it announced the acquisition of Quidsi, Amazon closed the Amazon Mom program to new members. Then a few weeks later, as the FTC was giving the deal unexpectedly close scrutiny, Amazon reopened Amazon Mom, but with smaller discounts. In effect, Amazon had hiked diaper prices soon after its acquisition of Quidsi.

The House Committee questioned whether Bezos had signed off on raising diaper prices after the acquisition. Bezos pled ignorance. "I don't remember that at all," he said. "We match competitive prices. I believe we followed diapers.com." Amazon shut Diapers.com down in 2017.

Recently, California and Washington state investigators have reportedly started examining the Company's business practices in their states.[11] The inquiries will similarly focus on how Amazon treats third-party sellers in its online marketplace.

Based on the foregoing, our client has ample reason to believe that possible breaches of fiduciary duty by the Company's fiduciaries occurred, necessitating this inspection demand. After reviewing the requested documents, our client will take further appropriate action if deemed necessary.

## SPECIFIC DEMANDS FOR INSPECTION

In keeping with the proper purpose outlined above, Ms. Rosati demands to inspect the books and records specified below. In making this demand to inspect the Company's books and records, our client notes that her inspection demand must be construed as liberally and with as much latitude as is afforded under Delaware law. Our client intends that this demand cover the Company's "books and records" in whatever form they take, to the fullest extent provided under Delaware's inspection demand jurisprudence. References to the "Board" in the request below shall mean the Board of Amazon. The term "Board" also includes any person, committee, or subcommittee acting on its behalf or in its stead. The time period for all requests is May 1, 2015 to the present, unless otherwise specified.

---

[11] *See* Weise and McCabe, *Amazon Said to Be Under Scrutiny in 2 States for Abuse of Power*, N.Y. Times (June 12, 2020), https://www.nytimes.com/2020/06/12/technology/state-inquiry-antitrust-amazon.html.

*Amazon.com, Inc. Stockholder Inspection Demand*
Page 13

In particular, our client demands to inspect:

1.     The Board books and records, including any minutes, resolutions, reports, presentations, or memoranda made, reviewed by, or provided to the Board, concerning:

      a.   the Company's biometrics identifier collection processes, including, without limitation, its facial recognition software, from November 1, 2016 to the present;

      b.   Rekognition, including, without limitation, the Company's use of the Diversity in Faces Dataset, from November 1, 2016 to the present;

      c.   any laws concerning the collection or use of biometric information, including, without limitation, BIPA;

      d.   the Company's collection and use of third-party seller data to develop competing products;

      e.   Quidsi, from January 1, 2009 to November 8, 2010;

      f.   any investigation concerning anticompetitive conduct by the Company, including, but not limited to, the EU's investigation into the Company's anticompetitive practices, Congress' investigation into the Company's anticompetitive practices; and California and Washington's investigation into the Company's anticompetitive practices; and

      g.   the *WSJ* article published on October 23, 2020, titled "Amazon Scooped Up Data from Its Own Sellers to Launch Competing Products."

2.     The communications to or from the Board concerning the topics in Demand No. 1.

3.     Books and records sufficient to identify all Company internal controls, policies, and procedures in place to ensure Amazon's financial standing are adequately and timely reported to management and the Board.

4.     Books and records sufficient to identify all Company internal controls, policies, and procedures in place to ensure Amazon's compliance with privacy laws are adequately and timely reported to management and the Board.

5.     Books and records sufficient to identify all Company internal controls, policies, and procedures in place to ensure Amazon's compliance with antitrust laws are adequately and timely reported to management and the Board.

*Amazon.com, Inc. Stockholder Inspection Demand*
Page 14

6.     Books and records sufficient to determine director independence, including the books and records concerning any related-party transaction and any director independence questionnaires.

7.     Documents provided in response to any other Section 220 demands investigating the same or similar matters identified in this demand.

### **CONCLUSION**

The books and records sought are described with reasonable particularity and directly relate to our client's proper purpose.  We request that you respond to this demand no later than five business days after its receipt, so that we may arrange a mutually convenient time and place for us to inspect the above-mentioned books, records, and minutes of Amazon.  If you need more time to produce the requested books, records, and minutes, we are amenable to discussing a reasonable timeframe.  In addition, we are willing to enter into an appropriate confidentiality agreement covering the documents our client will inspect.

If Amazon contends that this demand is incomplete or is otherwise deficient in any respect, please notify us immediately in writing setting forth the facts that the Company contends support its position and specifying any additional information believed to be required.  In the absence of such prompt notice, we will assume that Amazon agrees that this demand complies in all respects with the requirements of Section 220.

On behalf of Ms. Rosati, we affirm that the purpose for the demanded inspection as set forth above constitutes a true and accurate statement of the reasons our client desires to review the demanded books and records, and that such demand is made in good faith, under oath, and penalty of perjury.[12]  This purpose is both proper and reasonable as related to our client's interest as a stockholder.

We appreciate your diligent attention to this matter.  Ms. Rosati looks forward to Amazon fulfilling its legal obligation to permit her to inspect the above demanded records.  If you have any questions, please do not hesitate to contact us.

Sincerely,

Gregory E. Del Gaizo

Enclosures

---

[12]  The Oath notes that our client reviewed her demand in "substantially final form."  The only change between the version our client reviewed and the final version is the addition of the date and signature.  These minor nonsubstantive changes comply with the form and manner requirements of Section 220.  *Inter-Local Pension Fund GCC/IBT v. Calgon Carbon Corp.*, No. 2017-0910-MTZ, 2019 WL 479082, at *8 (Del. Ch. Jan. 25, 2019).

## POWER OF ATTORNEY

KNOW ALL PERSONS BY THESE PRESENT, that I, Michele Rosati, hereby make,

constitute, and appoint Gregory E. Del Gaizo of Robbins LLP, and any persons designated by him,

to act as a true and lawful attorney-in-fact for me, in my name, place, and stead, in all matters

regarding the examination of books and records of Amazon.com, Inc., and giving and granting

unto said attorney full power and authority to do and perform all and every act and thing

whatsoever requisite necessary and proper to be done in and without the premises, as fully, to all

intents and purposes as I might or could do, with full power of substitution and revocation, hereby

ratifying and confirming all that my attorney or the substitute shall lawfully do or cause to be done.

IN WITNESS WHEREOF, I have hereunto set my hand as of September 21 , 2020.

_____
MICHELE ROSATI

STATE OF NEW YORK      )
                       )  SS:
COUNTY OF NEW YORK     )

Subscribed and sworn to (or affirmed) before me on
this  21  day of September, 2020, by Michele
Rosati, proved to me on the basis of satisfactory
evidence to be the person who appeared before me.

Signature _____ (Seal)

CHARLES E. SEGURE, JR.
Notary Public - State of New York
No. 01SE6136197
Qualified in Kings County
My Commission Expires November 21, 2021

## OATH OF MICHELE ROSATI

I, Michele Rosati, being first duly sworn, hereby state and depose under penalty of perjury that:

I am a stockholder of Amazon.com, Inc., as evidenced by my account statement, a true and correct copy of which is attached hereto as Exhibit A.

I have reviewed the foregoing demand made pursuant to 8 Delaware General Corporation Law Code section 220, *et seq.* in substantially final form. The statements contained in the demand are true and correct to the best of my knowledge and belief.

I hereby affirm under penalty of perjury under the laws of the state of New York that the foregoing statements made by me are true and correct. Executed this __21__ day of September, 2020, at New York County, New York.

_____
MICHELE ROSATI

STATE OF NEW YORK   )
                    )  SS:
COUNTY OF NEW YORK  )

Subscribed and sworn to (or affirmed) before me on this __21__ day of September, 2020, by Michele Rosati, proved to me on the basis of satisfactory evidence to be the person who appeared before me.

Signature _____ (Seal)

CHARLES E. SEGURE, JR.
Notary Public - State of New York
No. 01SE6136197
Qualified in Kings County
My Commission Expires November 21, 2021

# Exhibit A



MICHELE ROSATI                                    Account Number: ▮▮▮▮▮

## *ITEMS FOR ATTENTION*                                            August 01, 2020 - August 31, 2020

| Security | Message | Date | Security | Message | Date |
|---|---|---|---|---|---|
|  |  |  |  |  |  |

## *YOUR CMA ASSETS*

| CASH/MONEY ACCOUNTS Description | Quantity | Total Cost Basis | Estimated Market Price | Estimated Market Value | Estimated Annual Income | Est. Annual Yield% |
|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |

| EQUITIES Description | Symbol | Acquired | Quantity | Unit Cost Basis | Total Cost Basis | Estimated Market Price | Estimated Market Value | Unrealized Gain/(Loss) | Estimated Annual Income |
|---|---|---|---|---|---|---|---|---|---|
| AMAZON COM INC  COM | AMZN | 06/19/17 | 6.0000 | 990.7000 | 5,944.20 | 3,450.9600 | 20,705.76 | 14,761.56 |  |
|  |  | 09/06/18 | 2.0000 | 1,957.0000 | 3,914.00 | 3,450.9600 | 6,901.92 | 2,987.92 |  |
|  |  | 10/10/18 | 2.0000 | 1,792.9000 | 3,585.80 | 3,450.9600 | 6,901.92 | 3,316.12 |  |
| *Subtotal* |  |  | *10.0000* |  | *13,444.00* |  | *34,509.60* | *21,065.60* |  |

+

018

# Exhibit B

Detailed Tracking



TRACK ANOTHER SHIPMENT

---

771599073360                    ☆    ⑦

**ADD NICKNAME**

# Delivered
## Wednesday, September 23, 2020 at 9:17 am

●━━━━━●━━━━━●━━━━━✓

**DELIVERED**
Signed for by: B.HAYDEN
**GET STATUS UPDATES**
**OBTAIN PROOF OF DELIVERY**

| FROM | TO |
|---|---|
| SAN DIEGO, CA US | SEATTLE, WA US |

## Shipment Facts

| TRACKING NUMBER | SERVICE | SHIPPER REFERENCE |
|---|---|---|
| 771599073360 | FedEx Standard Overnight | CASE 4613 |
| **SPECIAL HANDLING SECTION** | **SHIP DATE** | **ACTUAL DELIVERY** |
| Deliver Weekday | 9/22/20 ⑦ | 9/23/20 at 9:17 am |

## Travel History

| TIME ZONE |  |  |  | ⌄ |
|---|---|---|---|---|
| Local Scan Time |  |  |  |  |

Wednesday, September 23, 2020

| 9:17 AM | SEATTLE, WA | Delivered |
|---|---|---|